## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| BOHRER FARMS, INC.,<br><br>    Plaintiff,<br>v.<br><br>SYNGENTA CROP PROTECTION AG; SYNGENTA CORPORATION; SYNGENTA CROP PROTECTION, LLC; CORTEVA, INC.; BASF SE; BASF CORPORATION; BASF AGRICULTURAL PRODUCTS GROUP; NUTRIEN AG SOLUTIONS, INC., and HELENA AGRI-ENTERPRISES, LLC,<br><br>    Defendants. | Case No. 1:22-cv-2447 |

## CLASS ACTION COMPLAINT

1.     Every year, farmers in the United States purchase over ten billion dollars of crop protection products (which include agricultural "pesticides"), crucial farm inputs that improve crop yields and food security for everyone in the United States and its territories (the "**United States**").  And every year, United States farmers pay more than they should for these products because of the exclusive dealing arrangements between certain manufacturers and distributors in contravention of Section 3 of the Clayton Act (15 U.S.C. § 14).

2.     These farmers have paid and continue to pay inflated prices for crop protection products due to the unlawful conduct of certain manufacturers:

Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "**Syngenta**"); BASF SE, BASF Corporation, and BASF Agricultural Products Group (collectively, "**BASF**"); and Corteva, Inc. ("**Corteva**"; collectively with Syngenta and BASF, the "**Manufacturer Defendants**"); along with Co-conspirator Distributors, including Nutrien AG Solutions, Inc. ("**Nutrien**") and Helena Agri-Enterprises, LLC ("**Helena**"; together with Nutrien, the "**Co-conspirator Distributors**" or "**Co-conspirator Defendants**").  All of these of entities identified in paragraph 2 are referred to collectively herein as "**Defendants**".

3.    For many years, the Manufacturer Defendants developed what they called "loyalty" or "rebate" programs with cooperating Co-conspirator Distributors. Defendants used these "loyalty programs" to unfairly impede competitors and artificially inflate the prices that farmers pay for certain crop protection products. These programs substantially hindered access by farmers to lower-cost generic alternatives.

4.    The Manufacturer Defendants' respective loyalty programs have resulted in the stifling of generic competition and have preserved their monopoly power in connection with certain crop protection products, despite expired patent. Such unlawful conduct has resulted in and continues to cause substantial monetary damages to farmers across the country.

5.    Plaintiff, Bohrer Farms, Inc. ("**Plaintiff**" or "**Bohrer Farms**"), seeks to recover damages in the form of overcharges incurred by itself and the Classes

defined herein due to the violations of Manufacturer Defendants and Co-conspirator Distributors of the antitrust laws in the markets for certain crop protection products. The Manufacturer Defendants engaged in conspiracies to illegally extend and maintain their respective monopolies in certain crop protection products with the Co-conspirator Distributors by entering into loyalty programs to delay generic competition, in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and Section 3 of the Clayton Act (15 U.S.C. § 14). For these claims, Plaintiff and members of the Classes described herein seek treble damages and injunctive relief under 15 U.S.C. §§ 15 and 26, and other just relief.

6.      Plaintiff makes the allegations herein concerning itself based on personal knowledge and upon its current investigation and information and belief as to all other matters. Plaintiff continues to investigate additional products that may have been purchased relevant to the claims set forth herein and will timely supplement as appropriate or otherwise required.

## I.      NATURE OF THE CASE

7.      The Manufacturer Defendants have designed loyalty programs specifically for the purpose of excluding and marginalizing competitive generic crop-protection products, which enables the Manufacturer Defendants to maintain excessive, supra-competitive prices for their brand crop-protection products. The Manufacturer Defendants conspired with the Co-conspirator Distributors to execute these programs. This conspiracy caused and continues to cause farmers to overpay for these crucial inputs.

8.     "Basic" manufacturers like the Manufacturer Defendants initially develop, patent, and register the active ingredients ("**AI**") of crop protection products.  They can then extend the commercial potential of their innovations through lawfully obtained exclusive rights for a period of years.  After those patent and regulatory exclusivity periods expire, generic manufacturers can enter the market with equivalent products containing the same AI, relying upon the same toxicology and environmental impact data first developed by those basic manufacturers.  Once generic penetration is initiated, such competition from generic products predictably leads to dramatic price reductions, which benefits not only generic manufacturers, but also United States farmers and consumers.

9.     Defendants systematically undermined and frustrated the goals of this system. When patent exclusivity periods for their crop protection products expired and generic manufacturers threatened to launch lower-priced competing products, the Manufacturer Defendants used their loyalty programs to unlawfully boycott and or exclude generic manufacturers from the traditional distribution channel—a critical link between manufacturers and farmers.

10.     Under their respective programs, the Manufacturer Defendants offered each Co-conspirator Distributor—collectively comprising over 80% of all sales at the wholesale level—substantial payments conditioned on each Co-conspirator Distributor's sales of branded crop protection products and their agreement to limit sales by Co-conspirator Distributors of comparable generic products to a set low percentage share.  These written loyalty program agreements explicitly identify

these sales thresholds as provided below.

11.    The Manufacturer Defendants labeled these payments "rebates" or "incentives" for "loyalty."  Indeed, these payments were rewards for excluding or limiting competition by the Manufacturer Defendants' generic competitors.

12.    This exclusion or limitation of generic competition predictably resulted in, among other things, higher prices for the Plaintiff and other United States farmers than would have otherwise prevailed.  Co-conspirator Distributors participated in the loyalty programs, both because the Manufacturer Defendants offered rewards for participation, and because these Co-conspirator Distributors profited more highly than they otherwise would have by selling lower-priced generic products.

13.    The Co-conspirator Distributors dominate the sale of crop protection products in the United States.  Thus, the scheme among the respective Defendants has substantially foreclosed generic competitors from efficient distribution of their products.

14.    The Manufacturer Defendants expressly designed their programs to maintain their respective ability to price their respective products at issue above competitive levels while still unlawfully retaining large market shares.  The Manufacturer Defendants thus enjoyed outsized profits at the expense of farmers, including Plaintiff, during the "post-patent" period—when prices for farmers would otherwise fall substantially.

15.    The Manufacturer Defendants' loyalty programs enabled each of them

to maintain high prices and dominant market positions years after exclusivity for an off-patent AI.  The Manufacturer Defendants' schemes forced some generic manufacturers to exit markets encumbered by loyalty programs or to decide not to enter those markets as a direct result of those programs.  Even when Co-conspirator Distributors offered competing generics, their agreements with the Manufacturer Defendants restricted the sale of these generics to minimal volumes, forcing the generic manufacturers to market their products through less efficient channels of distribution.

16.    Absent Defendants' unlawful conduct, the Manufacturer Defendants would have faced increased generic competition, which would lead to increased choice and lower prices for U.S. farmers.  Unless these practices are enjoined, U.S. farmers will continue to be denied this access.

## II.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 26.

18.    Venue is proper in this District (the "**Judicial District**") pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b) and (c) because during the Class Period (as defined below), Defendants transacted business throughout the United States, including in this Judicial District.

19.    During the Class Period, the Manufacturer Defendants sold and shipped certain crop protection products in a continuous and uninterrupted flow of interstate commerce, which included sales of certain crop protection products in the

United States, including in this Judicial District. The Manufacturer Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this Judicial District.

20.    Likewise, the Co-Conspirator Distributors are geographically dispersed across the United States. They sold and shipped certain crop protection products in a continuous and uninterrupted flow of interstate commerce, which included sales of certain crop protection products in the United States, including in this Judicial District. The Co-Conspirator Distributors' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States.

21.    In addition, Corteva, Inc. maintains its corporate headquarters in the state of Indiana.

### III.    THE PARTIES

22.    Bohrer Farms is a corporation organized under the laws of the State of Indiana. Bohrer Farms is headquartered in and has its principal place of business is in Northern Indiana, where it owns and operates farmland and farming operations.

23.    Defendant, Syngenta Crop Protection AG, is a company headquartered in Basel, Switzerland with its North American headquarters in Greensboro, North Carolina. Defendant, Syngenta Corporation, is a corporate affiliate of Syngenta Crop Protection AG headquartered in Wilmington, Delaware. Syngenta Corporation is a corporation organized and operating under the laws of the State of Delaware.

24.    Defendant, Syngenta Crop Protection, LLC, is a limited liability

company organized and existing under the laws of the State of Delaware. It is headquartered in Greensboro, North Carolina and is also a corporate affiliate of Syngenta Crop Protection AG.

25.    Defendant, Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC, all transact or have transacted business in this Judicial District. Furthermore, each engages in the development, manufacture, and sale of certain crop protection products.

26.    Defendant, Corteva, is a publicly held corporation with its headquarters in Indianapolis, Indiana. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("**DuPont**") and Dow Chemical Company ("**Dow**"), which merged with Corteva as the surviving entity in 2017. Corteva is a corporation organized and existing under the laws of the State of Delaware.

27.    Corteva is located and transacts or has transacted business in this Judicial District and is engaged in the development, manufacture, and sale of certain crop protection products.

28.    Defendant, BASF SE, is a multinational global chemical company headquartered in Ludwigshafen, Germany. It is the largest chemical producer in the world. It transacts business in this Judicial District through its subsidiaries and divisions.

29.    Defendant, BASF Corporation, headquartered at 100 Park Avenue, Florham Park, New Jersey 07932, is the North American affiliate of BASF SE.

30.    Defendant, BASF Agricultural Products Group, is a division of BASF SE and is headquartered at 14385 West Port Arthur Road, Beaumont, Texas. It transacts or has transacted business in this Judicial District.

31.    Defendant, Nutrien, is a national wholesale distributor and retailer of crop protection products, including some or all the products at-issue in this action, with its corporate offices located in Loveland, Colorado. Nutrien transacts or has transacted business in this Judicial District. Nutrien is a corporation organized and existing under the laws of the State of Delaware.

32.    Defendant, Helena, describes itself as one of the nation's foremost agricultural distributors. It is headquartered in Collierville, Tennessee, and among other things, it distributes crop protection products, including some or all of the products at-issue in this action. Helena transacts or has transacted business in this Judicial District. Helena is a corporation organized and existing under the laws of the State of Delaware.

## IV.    INDUSTRY BACKGROUND

33.    The Manufacturer Defendants formulate, market, and sell crop protection products. Crop protection product manufacturers either synthesize the active ingredients for their formulated products in their own facilities or obtain the AI from other chemical manufacturers.

34.    The Manufacturer Defendants are called "basic" manufacturers. A basic manufacturer in the crop protection product market will research, develop, and patent new AIs. The Manufacture Defendants are among the largest crop

protection product manufacturers in the United States, as well as globally.

35.     Generic manufacturers of crop protection products alternatively sell products that contain AI created by others following the expiration of any patents or regulatory exclusivity periods (also known as "post-patent" AI).  Well over a dozen generic manufacturers sell crop protection products in the United States.

36.     Most pesticides sold in the United States are used for crop protection. They can kill or control pests, *i.e.*, diseases, weed, insects, and other organisms.  As used herein, and consistently with industry practice, the term "pesticides" refers collectively to insecticides (including nematicides), herbicides, and fungicides.

37.     Pesticides are frequently used by farmers to prevent the harm that pests cause to their crops.  The pesticides used for crop protection are referred to herein as "certain crop protection products."  Certain crop protection products are essential for farming as their use substantially boost quality and crop yields for reliable food supply.

38.     Crop protection products fall into the following three primary categories: (1) herbicides to target plants or weeds; (2) insecticides (including nematicides) to target insect infestations; and (3) fungicides to target fungal diseases.  Though each type of crop protection product has a separate target, all are still referred to generally as pesticides in common vernacular and within this complaint.

39.     Every crop protection product includes one or more AI.  AIs are chemical substances that kill or reduce the targeted pest.  A crop protection product

10

contains at least one AI, which is the chemical substance that kills or controls the targeted pest.  A finished crop protection product is comprised of an AI and an inert component (water, adjuvants, surfactants, or other active ingredients).  Final products with one active ingredient are considered "straight goods" and products with at least two active ingredients are considered "mixtures."

40.    AIs may be sold individually in "technical grade" or for "manufacturing use," before being formulated into a completed crop protection product.  Additional processing, however, is necessary before they can be used by farmers as final crop protection products.

41.    Several criteria serve to distinguish one AI from another.  These include: (a) the pest(s) targeted by an AI; (b) the effectiveness of an AI at controlling the targeted pest, which is often measured in terms of crop yield improvements; (c) the crops upon which an active ingredient is suited and registered to be used, which may correlate with geography; (d) the stage of the growing cycle at which an active ingredient may be used; and (e) the performance of an active ingredient under prevailing climate and weather conditions.

42.    Each AI has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest.  While AIs that share a common mode of action tend to have similar use cases, there are often differences in performance and other reasons why one active ingredient cannot readily replace another for a given application or a given condition.  Farmers may prefer one AI over another for various reasons,

including the specific performance characteristics of the active ingredient or a farmer's past success with an active ingredient. As a result, a chemically equivalent generic crop-protection product is a closer substitute for a given branded product than is a product containing a different AI.

43.     The market value for all crop protection products was estimated to be $12.1 billion in 2019. Herbicides accounted for about two-thirds of that amount, with sales estimated at $8.32 billion. Insecticides had estimated sales of $1.7 billion, and fungicides at $1.95 billion.[1]

44.     Congress enacted a patent and regulatory framework to govern crop protection products.[2] The regulations grant developers of new AI exclusivity from competition for that active ingredient for a period of twenty years.

45.     The regulations also facilitate generic entry upon the expiration of the exclusivity periods. To ensure the safety of new, innovative crop protection products, the Federal Insecticide, Fungicide, and Rodenticide Act ("**FIFRA**") requires submission, review, and approval by the United States Environmental Protection Agency ("**EPA**") prior to the sale or distribution of any pesticide to ensure product safety in the United States.

46.     After the EPA approves a new active ingredient, the original registrant (usually a basic manufacturer) gains the exclusive right to cite the data it submitted

---

[1] The US Agrochemical Market: Channel Facing Pressure of Profitability and Consolidation, New Commercial Approach Emerges, www.agropages.com (Oct. 16, 2020) (last accessed on Oct. 21, 2022).

[2] *See* http://npic.orst.edu/reg/laws.html (last accessed on October 20, 2022).

in support of the active ingredient for a baseline period of ten years. Frequently, this regulatory exclusive-use period extends the basic manufacturer's patent term and its right to the exclusive provision of products containing that AI. Following the patent and exclusivity, a generic manufacturer can enter the market with crop protection products containing the AI.  In doing so, it has to pay the basic manufacturer of the branded product for access to its data concerning the product. The cost of such access is called data compensation costs and can be as high as multiple millions of dollars.

47.    Within the crop protection products market, a manufacturer sells to a distributor who then sells to numerous retail outlets, including its own retailers, that have a strong farmer customer base.  This method is known as the traditional distribution channel, or just the "channel."

48.    Over ninety percent of crop protection product sales in the United States occur through the traditional distribution channel.  More than ninety percent of the traditional distribution channel is composed of just seven distributors.  Those seven distributors account for roughly eighty percent of crop protection product sales in the United States.

49.    The most efficient way for a crop protection product manufacturer to sell its product is through this traditional channel because: (a) distributors provide access to a network of retail and farmer customers and the logistics networks to service a broad range of customers; (b) manufacturers can reach thousands of retailers and farmers through selling to only a limited number of distributors; and

(c) distributors offer helpful services and functions including warehousing, transportation, credit, and marketing.

50.     When the market is operating without interference, generic crop protection products are typically priced substantially lower than their branded counterparts.  When a generic manufacturer obtains market access through a traditional channel, its entry into the market initiates price competition.  Both price and sales volume for the branded products then adjust downward.

51.     To protect against downward pricing and loss of product profits associated with generic entry, as alleged herein the Manufacturer Defendants have employed strategies designed to inhibit generic entry after the end of patent and regulatory exclusivity, and to minimize the competitive impact of such entry on branded products containing the same AI.  Efforts by the Manufacturer Defendants to incentivize Co-conspirator Distributors to circumvent that entry through so-called "loyalty programs" are an instrumental part of those strategies.

## V.    MANUFACTURER DEFENDANTS' UNLAWFUL CONDUCT

52.     The Manufacturer Defendants all used "loyalty programs," that is, exclusive dealing agreements, to stifle the distribution of competitive generic crop protection products.  This conduct directly impeded Plaintiff's and other farmers' access to less expensive generic crop protection products.  Defendants utilized these loyalty programs with the purpose, intent, and understanding that the programs would hinder generic competition and keep their AI prices higher than they would have been in a market free from interference.  Using these loyalty programs, the

14

Manufacturer Defendants retained market prices and market share of their branded products at levels higher than would otherwise be attainable following patent and regulatory expiry.

53.    Under their respective loyalty programs, the Manufacturer Defendants offer substantial exclusion payments to Co-conspirator Distributors conditioned on their limiting their sales of generic crop protection products containing specified post-patent AI.

54.    The Manufacturer Defendants are among the top 20 global agrochemical companies.  For example, in Fiscal Year 2021, Syngenta was reported to be number one (with $13.3 billion in sales), BASF was reported to be number three (with $7.7 billion in sales), and Corteva was reported to be number four (with $7.2 billion in sales).[3]

55.    The Manufacturer Defendants' loyalty programs sidelined generic manufacturers, allowing the Manufacturer Defendants to maintain market share despite pricing their crop protection products above competitive levels.  The programs allowed Co-conspirator Distributors to reap profits from prolonged elevated pricing of the Manufacturer Defendants' branded pesticides.  As to AIs that are the primary focus of this Complaint, each Manufacturer Defendant has substantially achieved and maintained its monopolistic goals through its loyalty program with Co-conspirator Distributors.  The Manufacturer Defendants have kept

---

[3] Upstream AG Insights For October 16, 2022, available at https://upstreamaginsights.substack.com/p/upstream-ag-insights-october-16th?utm_source=profile&utm_medium=reader2 (last accessed October 20, 2022).

generic manufacturers from supplying meaningful competition, which allowed the Defendants to raise, fix, maintain, or stabilize prices for certain crop protection products above competitive levels to the detriment of Plaintiff and other U.S. farmers.

### A.    Loyalty Agreements:  Their Operation and Effect.

56.    Syngenta's loyalty program is called the "Key AI" program.  Syngenta operates this program by agreement with its Co-conspirator Distributors.  BASF operates a similar program through what it now calls its "Share of Wallet" ("**SOW**") program with its Co-conspirator Distributors.  Corteva likewise operates a similar program through what it now calls its "Retailer Advantage" program with its Co-conspirator Distributors.

57.    Regardless of the program name, each Manufacturer Defendant's program generates supra-competitive profits, which each Manufacturer Defendant partially shares with the Co-conspirator Distributors.  Consequently, farmers are left with higher-priced brand products and limited or no choice of available generic substitutes.  By employing the exclusionary agreements, the Manufacturer Defendants have restricted access of farmers to the traditional distribution channel for those generic products.

58.    Over several years, Plaintiff has purchased multiple products, which are subject of the programs described below, from Co-Conspirator Distributors. Although the Manufacturer Defendants have used varying terminology and varying threshold requirements and EDI volumes as their programs developed, the

unlawful intent and nature of these agreements has remained consistent.

**B.    Operation of and Adherence to Loyalty Programs.**

59.    The Manufacturer Defendants retained unlawful loyalty-program agreements with specific Co-conspirator Distributors.  Those distributors account for 80% or more of all sales of crop protection products in the United States.

60.    The top seven sellers of crop protection products in the United States are, according to Crop Life, www.croplife.com: (1) Nutrien; (2) Helena; (3) SGS; (4) Growmark, Inc., based in Bloomington, IL; (5) Wilbur-Ellis Co., based in Aurora, CO; (6) CHS, based in Inver Grove, MN; and (7) Greenpoint, AG, based in Decatur, AL.  On information and belief, and subject to confirmatory discovery, these entities all participated in the Manufacturer Defendants' loyalty programs and are therefore alleged to be Co-conspirator Distributors.  The Plaintiff purchased at-issue products from one or more of these entities or their associated retailers.

61.    The Manufacturer Defendants' agreements with Co-conspirator Distributors provide exclusion payments in exchange for selling (and by prerequisite stocking) certain volumes of specific AIs.  Whether labeled as "loyalty thresholds," "loyalty requirements," or described in terms of "qualifying EDI products volumes," (where the acronym "EDI" refers to "Environmental Data Initiative"), these programs incentivize Co-conspirator Distributors to drastically limit both their supply and sales of generic products for specific AIs.

62.    Because the loyalty program incentive payments are so important to the Co-conspirator Distributors' profits, the loyalty programs ensure that they can

only sell minimal amounts of generic products to ensure they reach the obligatory thresholds.  In some instances, these distributors are forbidden by the loyalty program agreements from purchasing any products from generic manufacturers. Some have deferred generic product purchases until the end of the season to make sure they meet the required threshold under the loyalty programs, leaving farmers without a reasonable choice of product during the time farmers most need it.  The Manufacturer Defendants and the Co-conspiring Distributors have firmly upheld the terms of their loyalty programs.  If a Co-conspirator Distributor fails to so restrict its sales of generic product, pursuant to the loyalty program agreement, it will be monetarily penalized.

63.     The volume of sales by co-conspiring distributors assures participating distributors that no significant competing distributor will partner closely with lower-priced generic manufacturers.

### C.     The Manufacturer Defendants' Anticompetitive Activities Are Ongoing and Show No Sign of Ceasing.

64.     The Defendants had the opportunity to discuss and coordinate their respective loyalty programs through CropLife America ("**CLA**"), the national trade association that represents the manufacturers, formulators, and distributors of crop protection products.  Only manufacturers and distributors of crop protection products are eligible for full membership in CLA.  Corteva, BASF, and Syngenta are members of this trade association; a representative of Corteva formerly chaired its Board of Directors and its current chair, elected in 2022, is Paul Rea of BASF Agricultural Products Group.  Coordination with respect to loyalty programs was

also available through the Agricultural Retailers Association ("**ARA**").  That organization "advocates, influences, educates, and provides services to support its members in their quest to maintain a profitable business environment, adapt to a changing world and preserve their freedom to operate."[4]  Current members of the Board of ARA include representatives of Nutrien, Corteva, and Syngenta.  The CRA cooperates extensively with the ARA.

65.    Syswato Das, a spokesperson for Syngenta, has said that the loyalty programs are part of a longstanding "*voluntary and industry-standard program*" (emphases added) and asserted that "[w]e are disappointed that the FTC has failed to appreciate the beneficial effects that these rebate programs provide to our channel partners and to growers."  Kris Allen of Corteva expressed similar views.[5]  And Vern Hawkins, Syngenta's President of Crop Protection, has taken the extreme step of accusing Lina Khan of the FTC of lying in her aforementioned op-ed article.[6]

**D.    Relevant AIs.**

**Syngenta AIs.**

66.    Syngenta's loyalty program applies to a number of AIs, of which

---

[4] ARA, available at https://www.aradc.org/about/about-ara (last accessed Nov. 10, 2022).

[5] Margey Eckelcamp, "8 Things To Know About The FTC Suing Syngenta and Corteva" (Oct. 10, 2022) (available at https://www.thepacker.com/news/produce-crops/8-things-know-about-ftc-suing-syngenta-and-corteva) (last accessed Nov. 11, 2022).

[6] Meghan Grabner, "Syngenta Pushes Back Against  FTC Complaint" (Nov. 2, 2022) (available at https://brownfieldagnews.com/news/syngenta-pushes-back-against-ftc-complaint/) (last accessed Nov. 11, 2022).

Plaintiff has purchased over several years. Those Syngenta AIs that are the primary focus of this Complaint are metolachlor (and s-Metolachlor), mesotrione, azoxystrobin, paraquat, and lambda cyhalothrin. These are referred to collectively as the "Syngenta Relevant AI(s)."

67. ***Metolachlor (s-Metolachlor).*** Metolachlor (which term is used herein to refer to both the original metolachlor compound and the subsequent s-metolachlor variant, each as described below) is an herbicide used on a wide variety of crops, including corn, soybeans, grain sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and sugar beets. Sales of crop protection products containing metolachlor in the United States exceeded $400 million in 2020.

68. Syngenta's relevant patent protection for its original metolachlor expired in or about 1996. A Syngenta predecessor company developed, patented, and registered a variant of the original metolachlor, known as s-metolachlor. Syngenta's relevant patent protection for s-metolachlor and subsequent exclusive-use period for s-metolachlor expired in 2003. In 2016, one Syngenta loyalty program provided that s-metolachlor sales by a distributor or retailer that reached the 90% threshold were subject to a 5% incentive rebate.

69. During the relevant period, Plaintiff, at a minimum, purchased the following Syngenta products containing metolachlor from Co-conspirator Defendants Nutrien and/or Helena: Dual II MAGNUM brands.

70. ***Mesotrione.*** Mesotrione is a widely used corn herbicide. Sales of crop protection products containing mesotrione in the United States exceeded $200

million in 2020. Mesotrione was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). Syngenta's relevant patent protection for mesotrione has expired.

71.    Under its loyalty program, Syngenta made exclusion payments to Co-conspirator Distributors for their not marketing significant volumes of competing, lower-priced generic mesotrione products. In 2016, one Syngenta loyalty program provided that distributors or retailers who recorded 99% of branded mesotrione products could obtain a 5% loyalty rebate.

72.    Generic manufacturers have made few inroads with distributors.[7] At least two generic manufacturers delayed or terminated their planned entry into the mesotrione market due to loyalty-program concerns.[8]

73.    ***Azoxystrobin***. Azoxystrobin is a broad-spectrum fungicide that protects a wide variety of crops from fungal diseases. It has annual global sales of over $1 billion. Sales of crop protection products containing azoxystrobin in the United States exceeded $100 million in 2020. Azoxystrobin was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Syngenta's exclusive-use period under FIFRA has expired. In 2016, one Syngenta

---

[7] Syngenta also posted misleading articles on its website, indicating that generic mesotrione and other generic crop protection products were inferior to its branded mesotrione. *See* Syngenta Products Offer Benefits That Generic Products Don't, available at https://www.syngenta-us.com/thrive/production/branded-products-over-generics.html (last accessed October 20, 2022).

[8] Plaintiff allege these facts based upon information recently made public in the FTC Action. The names of the generic manufacturers and the details of their delayed entry to the mesotrione market are redacted from the public filing.

loyalty program provided that azoxystrobin was subject to a 98% loyalty threshold requirement for which a distributor or retailer could obtain a 10% rebate.

74.    During the relevant period, Plaintiff, at a minimum, purchased the following Syngenta products containing azoxystrobin from Co-conspirator Defendants Nutrien and/or Helena: Quadris, Quilt, and Quilt Xcel.

75.    ***Fomesafen.***  Fomesafen is a widely used selective-applied and foliar herbicide for control of broadleaf weeds in soybeans.  In 2018, approximately six million pounds of fomesafen were applied.  Fomesafen was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). In 2016, one Syngenta loyalty program provided that fomesafen was subject to a 90% retailer support threshold for which distributors or retailers received a 5% rebate.

76.    During the relevant period, Plaintiff, at a minimum, purchased the following Syngenta products containing fomesafen from Co-conspirator Defendants Nutrien and/or Helena: Flexstar.

77.    ***Paraquat.***  Paraquat is one of the most-widely used herbicides.  It had annual global sales of over $90 million in 2021.  Paraquat was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Syngenta's exclusive-use period under FIFRA has expired.  In 2004, a Syngenta loyalty program provided that paraquat was subject to a 98% loyalty threshold requirement for which a distributor or retailer could obtain a 5% rebate.

78.    During the relevant period, Plaintiff, at a minimum, purchased the

following Syngenta products containing paraquat from Co-conspirator Defendants Nutrien and/or Helena: Gramoxone SL 2.0.

79.    ***Lambda Cyhalothrin.*** Lambda Cyhalothrin is an agricultural pesticide.  Sales of Lambda Cyhalothrin in 2020 have been estimated at $1.25 billion worldwide.  Lambda Cyhalothrin was initially developed by a Syngenta predecessor company and was registered by the EPA in 1988.  Syngenta has sold and sells products containing Lambda Cyhalothrin under the names Karate® and Warrior®, among others.  Lambda Cyhalothrin was protected by patent until 2003.

80.    In 2004, one Syngenta loyalty program provided that Lambda Cyhalothrin was subject to an 98% loyalty threshold requirement for which a distributor or retailer could obtain a 5% incentive payment from Syngenta.  In 2016, one Syngenta loyalty program provided that Lambda Cyhalothrin was subject to an 85% loyalty threshold in exchange for a 5% incentive payment from Syngenta.

81.    During the relevant period, Plaintiff, at a minimum, purchased the following Syngenta products containing lambda cyhalothrin from Co-conspirator Defendants Nutrien and/or Helena:  Warrior, Warrior II with Zeon Technology, in additional to other Syngenta products containing lambda cyhalothrin whose trade names have changed over time and are still being identified by Plaintiff.

82.    Under its loyalty program, Syngenta has made exclusion payments to Co-conspirator Distributors for their not marketing significant volumes of competing, lower-priced generic Syngenta Relevant AI products.  As noted in the Syngenta documents discussed above, Syngenta Relevant AI sales by a distributor

or retailer that reached exceptional threshold ranges, in some cases as high as 99%, were subject to significant incentive rebates worth millions to participating co-conspirators.

83. During the relevant time period, Syngenta's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of Syngenta's Relevant AI products. As a result, Syngenta and Co-conspirator Distributors have benefitted from supra-competitive prices of Syngenta Relevant AI products even though generic manufacturers introduced competing AI products in the United States after the expiration of Syngenta's Relevant AI(s) patent exclusivity. Generic products of these same AIs were priced significantly below Syngenta's existing crop protection products.

84. Under Syngenta's loyalty programs, Co-conspirator Distributors strictly managed their generic AI(s) open space, focused marketing on Syngenta Relevant AI products rather than generic competitors to those same AI products, and in some cases, stopped selling generic products despite customers' continued demand for lower-priced Syngenta Relevant AI products. The loyalty program ensures Co-Conspirator Distributors sell minimal amounts of, if any, generic Syngenta Relevant AI crop protection products in exchange for loyalty rebates predicated on their not selling the same AI crop protection products made by generic producers.

85. Syngenta's prices remain significantly above competitive levels. Syngenta's and Co-conspirator Distributor's loyalty program has resulted in higher

prices for crop protection products containing each of Syngenta's Relevant AIs than would prevail in a competitive market.

**BASF AIs.**

86.    As recent as 2022, BASF loyalty program extended to five products, all of which are believed to be off patent:

(1) ***boscalid***, a broad spectrum carboxinide herbicide initially used with specialty crops and now extended to other crops such as cereals and oilseed;

(2) ***F500***, a speedy and long-lasting effectiveness in controlling a broad range of key fungal diseases in sensitive populations in over 60 crops;

(3) ***glufosinate ammonium***, one of the most widely-applied broad spectrum herbicides, used in controlling weeds in a huge variety of worldwide crops;

(4) ***imazamoz***, a selective broad-spectrum herbicide used for eliminating broadleaf and grassweed, particularly in connection with soybean crops; and

(5) ***pendimethalin***, a premergence and postmergence herbicide used to control grasses and broadleaf weeds.

87.    All these crop protection products are among BASF's most profitable. These five products are referred to herein as the "BASF Relevant AI(s)."

88.    During the relevant period, Plaintiff, at a minimum, purchased the following products containing BASF Relevant AIs from Co-conspirator Defendants Nutrien and/or Helena: Headline AMP, Headline EC, Headline SC, Revytek, Veltyma, Liberty, BASF sourced private label Glufosinate-ammonium, and Pursuit.

89.    During the relevant time period, BASF's loyalty program substantially

limited and foreclosed generic manufacturers from providing effective competition in the sale of acetochlor products. As a result, BASF and Co-conspirator Distributors have benefitted from supra-competitive prices of acetochlor products. Generic manufacturers introduced acetochlor products in the United States after the expiration of BASF's patent exclusivity. Generic competitors to products containing the BASF Relevant AI(s) were priced lower than those products. Still, generic manufacturers have made few inroads with distributors.

90.    Under the loyalty program, Co-conspirator Distributors strictly managed their generic acetochlor open space, focused marketing on the BASF Relevant AI products rather than generic products, and in some cases, stopped listing generic products despite customers' continued demand for lower-priced counterparts. The loyalty program ensures Co-Conspirator Distributors sell minimal amounts of, if any, generic acetochlor crop protection products.

91.    BASF's loyalty program has deterred generic manufacturers from introducing counterparts to products containing the BASF Relevant AI(s) in the United States at all, or from offering innovative new products.

92.    BASF's prices for the BASF Relevant AI(s) and products containing them remain significantly above competitive levels. BASF's and Co-conspirator Distributor's loyalty program agreements have resulted in higher prices for crop protection products containing acetochlor than would prevail in a competitive market.

93.    BASF's prices remain significantly above competitive levels. BASF's

and Co-conspirator Distributors' loyalty program agreements have resulted in higher prices for crop protection products containing BASF Relevant AI(s) than would prevail in a competitive market.

**Corteva's Relevant AIs.**

94.     Corteva's loyalty program applies to a number of AIs.  Those Corteva AIs that are primary focus of this Complaint are oxamyl, rimsulfuron, and acetochlor (collectively the "**Corteva Relevant AI(s)**").

95.     *Oxamyl*. Oxamyl is an insecticide and nematicide used primarily on cotton and potatoes, in addition to onions, apples, citrus fruits, pears, carrots, peppers, tomatoes, and tobacco. Oxamyl was initially developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont).  Corteva's relevant patent protection and the exclusive-use period under FIFRA have expired.

96.     *Rimsulfuron.* Rimsulfuron is an herbicide used on crops such as fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes. Rimsulfuron was originally developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont).  Corteva's relevant patent protection for rimsulfuron and the exclusive-use period under FIFRA expired no later than 2007.

97.     *Acetochlor.*  Acetochlor is an herbicide that is used predominantly on corn, but also is used on cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane.  Sales of crop protection products containing acetochlor in the United States exceeded $400 million in 2020.

98.     During the relevant period, Plaintiff, at a minimum, purchased the

following products Corteva products containing acetochlor from Co-conspirator Defendants Nutrien and/or Helena: Warrant and Harness Xtra.

99.    The EPA granted registration for acetochlor in 1994 to the Acetochlor Registration Partnership ("**ARP**"), a joint venture of basic manufacturers.  The ARP continues to hold the United States registration for acetochlor; its current partners are Corteva and Bayer.  Bayer manufactures acetochlor for both parties.  Relevant patent protection for acetochlor has expired.

100.    Under its loyalty program, Corteva has made exclusion payments to Co-conspirator Distributors for their not marketing significant volumes of competing, lower-priced generic Corteva Relevant AI products.  Under one of its loyalty programs, Corteva Relevant AI(s) sales by a distributor or retailer that reached exceptional threshold ranges, in some cases as high as 105%, were subject to significant incentive rebates worth millions to participating co-conspirators.

101.    During the relevant time period, Corteva's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of Corteva's Relevant AI products.  As a result, Corteva and Co-conspirator Distributors have benefitted from supra-competitive prices of Corteva's Relevant AI products even though generic manufacturers introduced competing AI products in the United States after the expiration of Corteva's Relevant AI(s) patent exclusivity.  Generic products of these same AIs were priced significantly below Corteva's existing crop protection products.

102.    Under Corteva's loyalty programs, Co-conspirator Distributors strictly

managed their generic AI(s) open space, focused marketing on Corteva Relevant AI products rather than generic competitors to those same AI products, and in some cases, stopped selling generic products despite customers' continued demand for lower-priced Corteva Relevant AI products. The loyalty program ensures Co-Conspirator Distributors sell minimal amounts of, if any, generic Corteva Relevant AI crop protection products in exchange for loyalty rebates predicated on their not selling the same AI crop protection products made by generic producers.

103. Corteva's prices remain significantly above competitive levels. Corteva's and Co-conspirator Distributor's loyalty programs have resulted in higher prices for crop protection products containing each of Corteva's Relevant AIs than would prevail in a competitive market.

## VI.  MARKET POWER AND DEFINITION

104. The relevant geographic market is the United States. United States farmers may not lawfully use crop protection products manufactured and labeled for use outside the United States.

105. Separate relevant product markets exist for Syngenta's Relevant AIs (azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin) (the "**Syngenta AIs Market**"), for BASF's Relevant AIs (boscalid, glufosinate, pendimethalin, F500, and imazamox) (the "**BASF AIs Market**"), and for Corteva's Relevant AIs (rimsulfuron, oxamyl and acetochlor) (the "**Corteva AIs Market**"; collectively with the Syngenta AIs Market and BASF AIs Market, the "**Relevant AI Markets**").

106.    Each Manufacturer Defendant's Relevant AI Market consists of: (1) the technical-grade or manufacturing-use of the each of the Manufacturer Defendant's Relevant AIs to be formulated into an EPA-registered finished crop protection product for sale in the United States, and (2) each Manufacturer Defendant's Relevant AIs as a component of an EPA-registered finished crop protection product for sale in the United States.

107.    Each Manufacturer Defendant's Relevant AI Market is no broader than EPA-registered crop protection products for sale in the United States that contain that Manufacturer Defendant's Relevant AIs.  Each Manufacturer Defendant's Relevant AI Market includes branded and generic versions of each of its Relevant AIs.

108.    As to each Relevant AI, allegations herein relating to the Relevant AI Market(s) apply to both sets of product markets described above.

109.    At all relevant times, Syngenta had monopoly power in the markets for azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin, with respect to crop protection products containing those specific Relevant AIs, because Syngenta had the power to price Relevant AIs and crop protection products containing those Relevant AIs at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as azoxystrobin, mesotrione, metolachlor, fomesafen, parquat, and lambda cyhalothrin and crop protection products containing those Relevant AIs.

110.    At all relevant times, BASF had monopoly power for Boscalid, F500,

Glufosinate ammonium, Imazamox, and Pendimethalin, and with respect to crop protection products containing those specific Relevant AIs, because BASF had the power to price Relevant AIs and crop protection products containing those Relevant AIs at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as respect to the BASF Relevant AIs, and with respect to crop protection products containing those Relevant AIs.

111.   At all relevant times, Corteva had monopoly power for rimsulfuron, oxamyl, acetochlor, and with respect to crop protection products containing those specific Relevant AIs, because Corteva had the power to price Relevant AI and crop protection products containing those Relevant AI at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as respect to rimsulfuron, oxamyl, acetochlor, and with respect to crop protection products containing those Relevant AIs.

112.   During the relevant period, the Manufacturer Defendants have dominated their respective Relevant AI markets with sales of their own branded Relevant AIs and crop-protection products containing those Relevant AIs and by excluding generic competition through operation of each Defendant's loyalty program.

113.   To the extent that Plaintiff and Class Members may be required to prove market power circumstantially by first defining a relevant product market, Plaintiff alleges that the relevant product market is composed of each Defendant Manufacturer's Relevant AIs and crop protection products containing those

Relevant AIs, both brand and generic, in all forms sold in the United States.

114.    For each Defendant Manufacturer's Relevant AI(s), other AIs are not close enough functional or economic substitutes to prevent the Manufacturer Defendants from maintaining prices of crop protection products containing their specific Relevant AIs above competitive levels.

115.    For each Defendant Manufacturer's Relevant AI(s), absent the restraints of trade imposed by the Manufacturer Defendants' loyalty programs, unconstrained competition from generic crop protection product manufacturers would have had a significant and non-transitory downward effect on prices in that specific Relevant AI(s) Market.

116.    Direct evidence of each Manufacturer Defendant's monopoly and market power includes each Defendant's ability to price its Relevant AIs and crop protection products containing those Relevant AIs above competitive levels, and to exclude competition from generic manufacturers through operation of its loyalty program.

117.    The Manufacturer Defendants have maintained and exercised the power to exclude and restrict competition to their respective Relevant AIs and crop protection products containing those Relevant AIs, which no longer had any patent protection.

118.    Each Manufacturer Defendant's monopoly power is also shown through circumstantial evidence, including dominant or substantial market shares in its relevant market with substantial barriers to entry.

119.    Potential generic manufacturers face significant capital, technical, regulatory, and legal barriers.  The Manufacturer Defendants' use of loyalty programs also imposed a substantial barrier to entry by, among other things, limiting generic manufacturers' access to the traditional distribution channel.

120.    Syngenta maintained dominant shares of the United States Relevant Market for its Relevant AIs azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin from at least 2017 through the present.

121.    BASF maintained dominant shares of the United States Relevant Market for its Relevant AIs boscalid, F500, glufosinate ammonium, imazamoz, and pendimethalin from at least 2004 through the present.

122.    Corteva maintained dominant shares of the United States Relevant Market for its Relevant AIs rimsulfuron, acetochlor, oxamyl.  Each year from at least 2017 through the present, Corteva maintained a substantial share of sales in each of these markets.

## VII.   ANTITRUST IMPACT AND DAMAGES TO THE CLASSES

123.    The Manufacturer Defendants' anticompetitive conduct had the following effects in each Relevant AI market:

a)  Competition in each Relevant AI market was reduced or eliminated;

b)  Prices have been maintained at supra-competitive levels; and

c)  United States farmers and purchasers have been deprived of the benefit of price competition, product choice, and

innovation in each Relevant AI market.

124.    As described herein, during the Class Period, Plaintiff directly purchased Relevant AIs from Co-conspirator Distributors.

125.    As a result of the Defendants' anticompetitive conduct, Plaintiff and Members of the Classes paid more for Relevant AIs than they otherwise would have and thus suffered substantial damages to their business or property in the form of overcharges.  This is a cognizable antitrust injury and constitutes harm flowing from the affect Defendants' illegal agreements and resulting monopolization on competition under the federal antitrust laws.

126.    The Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Manufacturer Defendants' monopoly of the Relevant AIs market(s) and limiting competition after the entry of generic Relevant AI.  Defendants' actions allowed the Manufacturer Defendants to maintain a monopoly and exclude competition in the Relevant AIs market(s) and to artificially maintain market share and prices.

127.    Through operation of the Manufacturer Defendants' loyalty program agreements, as alleged herein, generic manufacturers were discouraged from developing and marketing generic versions of the Relevant AIs, have exited the Relevant AI Market(s), and have faced an unfair competitive landscape even when they have been able to enter.  But for the illegal conduct of Defendants, additional generics of Relevant AIs would have entered and captured market share.

A. **Defendants' Unlawful Conduct Prevented and Continues to Prevent Generic Expansion and Caused and Continues to Cause Generic Exit from Markets.**

128.    The Defendants' loyalty program agreements have prevented, delayed, and diminished both entry and expansion of generic manufacturers of crop protection products containing the Relevant AI.  The same wrongful conduct caused generic exit as to products containing the Relevant AI.

129.    Due to the competitive landscape and difficulty of entering traditional distribution chains for the Relevant AI, multiple generic manufacturers have concluded that entry is not economically feasible due to the artificial constraints created by Defendants' loyalty program agreements.  The loyalty programs foreclosure of sales opportunities for Relevant AI led one generic manufacturer not to re-register its product in a Relevant AI market.

130.    In the absence of Defendants' respective loyalty program agreements, generic manufacturers would compete more effectively and compete for more sales in the Relevant AI Market(s).

131.    Defendants' loyalty programs inhibited generic manufacturers' ability to access the Relevant AI market(s) to create downward pricing pressure.

132.    Defendants together foreclosed actual or potential competitors from access to efficient and effective distribution services.  With respect to the Relevant AI Market(s), this exclusion of generic competitors from the traditional distribution channel harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient, lower-cost distribution.

**B.      Defendants' Unlawful Conduct Increased and Continues to Increase Prices to Farmers in the Relevant AI Market(s).**

133.    The most efficient and effective channel of distribution for each AI in the Relevant Market is the traditional distribution channel.  Over ninety percent of all crop protection product sales are made through the traditional channel.  A high proportion of the traditional channel participates in the Manufacturer Defendants' loyalty programs (over 80%).

134.    The Manufacturer Defendants' loyalty programs with Co-Conspirator Distributors have high market share thresholds.  Thus, these loyalty program have effectively foreclosed generic competitors from approximately 80% or more of each Relevant AI Market from access to the traditional channel.  This practice continues and should be enjoined.

135.    The Manufacturer Defendants' loyalty programs incentivize Co-conspirator Distributors to meet loyalty thresholds by forgoing or severely limiting purchases from generic manufacturers.  Substantially all major distributors and leading retailers participate in the respective loyalty programs.  Co-Conspirator Distributors profit more when prices to farmers are higher.  Their collective participation in the loyalty programs has had and continues to have the effect of maintaining higher prices to Plaintiff and Class Members.  Through Syngenta's and Corteva's respective loyalty programs, Co-Conspirator Distributors have severely limited their purchase, promotion, and sale of generic crop protection products containing each applicable Relevant AI.

136.    To meet applicable loyalty thresholds Co-conspirator Distributors have

omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered farmers toward branded products.

137. Through Manufacturer Defendants' respective loyalty programs, Co-Conspirator Distributors have declined to buy or sell more than minimal amounts of crop protection products containing each applicable Relevant AI from generic manufacturers even though (1) generic products are of sufficient quality and availability; (2) generic manufacturers work to create demand for their products at the farmer and retailer levels; and (3) absent the Manufacturer Defendants' loyalty programs, demand for generic products containing each applicable Relevant AI would exceed the open space allowed under the Manufacturer Defendants' respective loyalty programs.

138. This dynamic is so well established in the industry that it is futile for generic manufacturers to approach any large Co-conspirator Distributor. In contrast, when selling products containing AI that are not subject to loyalty programs, generic manufacturers are able to make all or nearly all their sales through traditional-channel distributors.

139. Generic manufacturers of crop protection products containing the applicable Relevant AI have thus been substantially foreclosed from the Relevant Markets for five years or more, to the detriment of not only the generic manufacturers but also U.S. farmers.

140. The exclusion of generic competitors from the traditional channel

harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient and effective lower-cost distribution.

141.    With respect to each Relevant AI, in the absence of Defendants' mutual participation in the loyalty programs, generic manufacturers would have made significantly more sales through the traditional distribution chain.  This generic competition would have increased price competition, innovation, and choice in the Relevant AI Market(s), which in turn would benefit U.S. farmers, including Plaintiff.

142.    In the absence of the Manufacturer Defendants' respective loyalty programs, sales of generic crop protection products containing active ingredients subject to the programs, including each Relevant AI, would be significantly higher and would exceed the open space allowed by the programs.  Plaintiff and US farmers would benefit from having an increased amount of lower-price generic products available in Relevant AI Market(s).

143.    In at least the azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin Relevant AI Markets, Syngenta further foreclosed competition through its retail loyalty program.  As with the distributor program, the retail program has substantially foreclosed generic manufacturers from efficient and effective distribution of their products, given the participation of leading retailers in the program.  The same is true of the Relevant AIs for Corteva and BASF and the products containing them.

144.    Defendants' loyalty program agreements resulted in higher prices to

farmers by limiting the amount of available generic Relevant AI.

145. The Manufacturer Defendants' respective downward price responses, and responses of prices more generally in the applicable Relevant AI Market(s), have been less significant, and slower, than they would have been absent operation of the applicable loyalty program.

146. Defendants' anticompetitive conduct was not reasonably necessary to achieve any cognizable procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, and each Defendant could reasonably achieve any procompetitive goals through less restrictive alternatives.

### C. Defendants' Unlawful Conduct Resulted and Continues to Result in Supra-Competitive Prices.

147. The Manufacturer Defendants' loyalty programs with Co-conspirator Distributors have resulted in higher prices to farmers for crop protection products containing applicable Relevant AI than would prevail in competitive markets. Each Defendant's anticompetitive conduct thwarted the downward price pressure from generic manufacturers' entry and expansion, denying these generics access to efficient and effective distribution and resulting in artificially high prices.

148. Because the loyalty programs artificially limit the availability of lower-priced generic alternatives, farmers are left to pay more for brand crop protection products containing the AI. Without the availability of cheaper, generic crop protection products in the traditional distribution channel, Plaintiff and members of the Classes set forth herein often must buy the more expensive, branded product—because the brand product is promoted and favored by the traditional distribution

channel.

149.   In a competitive world where generic manufacturers can access the market for an AI, they put downward pressure on the prices of branded products containing that relevant AI.  The more access generic manufacturers obtain, the more price pressure they exert.  This downward price pressure affects not only lower-end brands for which generics have exact substitutes upon entry, but all products containing the AI, including higher-end mixture products.

150.   Despite access to non-traditional distribution channels in which generic manufacturers can enter and sell at low prices, the Manufacturer Defendants' loyalty programs with Co-conspirator Distributors limit the overall amount of available generic product in the Relevant AI market(s) because of the traditional channels' predominance in supply and demand chain.  The limited availability of generics in the Relevant AI market(s) allows distributors or retailers to then price generic higher than would have been possible otherwise, thus preventing the full benefits of generic price competition from flowing to farmers.

151.   Even where generic manufacturers were able to enter a Relevant AI Market, the Manufacturer Defendants' loyalty programs with Co-conspirator Defendants successfully limited the effects of this competition.  The Manufacturer Defendants' respective price responses, and responses of prices more generally in the Relevant AI Market(s), have been less significant, and slower, than they would have been absent operation of the Manufacturer Defendants' loyalty programs with the Co-conspirator Distributors.

## VIII.  PLAINTIFF AND CLASS ALLEGATIONS

152.    Plaintiff brings this action on behalf of itself and as a class action

under the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil

Procedure, on behalf of members of the following Plaintiff Classes (each a "**Classes**"

and together, the "**Classes**"):

> All persons or entities in the United States that purchased azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, or lambda cyhalothrin, or any crop protection product containing azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, or lambda cyhalothrin directly from Syngenta, or any distributor or retailer participating in Syngenta's Loyalty Program for such active ingredients, beginning January 1, 2004, until the effects of the unlawful conduct cease (the "**Syngenta Class Period**");

> All persons or entities in the United States that purchased rimsulfuron or oxamyl, or any crop production products containing acetochlor, rimsulfuron or oxamyl, directly from Corteva or any distributor or retailer participating in Corteva's Loyalty Program for such active ingredients, beginning January 1, 2004, until the effects of the unlawful conduct cease (the "**Corteva Class Period**"); and

> All persons or entities in the United States that purchased Boscalid, F500, Glufosinate ammonium, Imazamox, or Pendimethalin, or any crop production products containing them, directly from BASF or any distributor or retailer participating in BASF's Loyalty Program for such active ingredients, beginning January 1, 2004, until the effects of the unlawful conduct cease (the "**BASF Class Period**"; collectively with the Syngenta Class Period and the Corteva Class Period the "**Class Period**").

153.    All of these Classes seek treble damages and injunctive relief under 15

U.S.C. §§ 15 and 26.

154.    Excluded from the Classes are: (a) the Manufacturer Defendants and

their subsidiaries, affiliate entities, employees, and co-conspirators (*i.e*, distributors

or retailers participating in the Manufacturer Defendants' loyalty programs

involving the at-issue products), (b) entities that purchased crop protection products for resale to others, and (c) all federal or state government entities or agencies.

155.    Members of the Classes are so numerous and geographically dispersed that joinder is impracticable.  Further, members of the Classes are readily identifiable from information and records in Defendants' possession.

156.    Plaintiff's claims are typical of the claims of the members of the Classes.  Plaintiff and members of the Classes were damaged by the same wrongful conduct of Manufacturer Defendants and Co-conspirator Distributors.

157.    Plaintiff will fairly and adequately protect and represent the interests of members of the Classes.  Plaintiff's interests are coincident with, and not antagonistic to, those of members of the Classes.

158.    Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation.

159.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

160.    Questions of law and fact common to members of the Classes predominate over questions that may affect only individual Class members, thereby making a class action with respect to members of each Class as a whole appropriate. Questions of law and fact common to Plaintiff and members of the Classes include,

but are not limited to:

    a.  Whether Syngenta conspired with Co-conspirator Distributors to unreasonably restrain trade in violation of federal antitrust laws;

    b.  Whether Corteva conspired with Co-conspirator Distributors to unreasonably restrain trade in violation of federal antitrust laws;

    c.  Whether BASF conspired with Co-conspirator Distributors to unreasonably restrain trade in violation of federal antitrust laws;

    d.  Whether Syngenta and Co-conspirator Distributors unlawfully monopolized or conspired to monopolize the Relevant AIs;

    e.  Whether Corteva and Co-conspirator Distributors unlawfully monopolized or conspired to monopolize the Relevant AIs;

    f.  Whether BASF and Co-conspirator Distributors unlawfully monopolized or conspired to monopolize the Relevant AIs;

    g.  The scope and duration of the alleged conspiracies;

    h.  Whether Syngenta and Co-conspirator Distributors violated Section 3 of the Clayton Act;

    i.  Whether Corteva and Co-conspirator Distributors violated Section 3 of the Clayton Act;

    j.  Whether BASF and Co-conspirator Distributors violated Section 3 of the Clayton Act;

    k.  Injury suffered by Plaintiff and members of the Classes;

    l.  Injunctive relief available to the Plaintiff and members of the Classes; and

    m.  Damages suffered by Plaintiff and members of the Classes.

161.   The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential

difficulties in management of this class action.

162.    Plaintiff reserves the right to amend the definition of members of the respective Classes, including, without limitation, the Class Period.

## IX.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

163.    By equitable estoppel, Defendants' concealment of their unlawful combination and conspiracy has tolled any applicable statute of limitations for Plaintiff and the Classes with respect to any claims and rights of action that Plaintiff and the Classes have alleged in this Complaint.

164.    Plaintiff and the Classes were not placed on actual or constructive notice of the conspiracies alleged herein until, at the earliest, the FTC's and AGs' September 29, 2022 complaint made public its investigation into the Manufacturer Defendants' misconduct and its allegations that Manufacturer Defendants' loyalty program agreements with the Co-conspirator Distributors restrained competition and caused higher prices, among other harms.

165.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and the Classes.

166.    Defendants maintain and enforce strict confidentiality provisions in their agreements with one another and the conditions and descriptions of their respective loyalty programs.  Distributors' contracts also contain strict confidentiality provisions, prohibiting the disclosures of prices retailers pay to wholesalers for the Relevant AI products.

167.    The Manufacturer Defendants all publicly stated that they were in compliance with federal laws that governed their conduct, including federal antitrust laws. Plaintiff and members of the Classes could and did rely on such statements and thus were misled into believing that no anticompetitive activity was occurring.

168.    For example, Syngenta says in its current Code of Conduct ("**CoC**")[9] at page 6 that'[a]s an industry leader, we take our responsibilities very seriously.  We are transparent and responsible and comply with all applicable laws and ensure that employees are aware of those laws relevant to those roles."  At page 8 of the same document, Syngenta states that "[w]e ensure that all business practices comply with the competition law wherever business is conducted. Competition laws apply to business conduct in general and to all business arrangements, irrespective of whether they are written, oral, or in any other form."

169.    Corteva's CoC[10] states at page 12 that "[w]e conduct business ethically. Every time we represent Corteva Agriscience, it is our chance to make a positive impression.  We speak with pride, honesty, and transparency about our work to promote trust, confidence, and sustainable business."  At page 14 of the same document, Corteva states that it does not "interfere with our competitors' business

---

[9] Available at https://www.syngentagroup.com/sites/syngenta-group/files/governance/code-of-conduct/syn-240-sg-coc-english-aw5.pdf (last accessed Nov. 16, 2022).

[10] Available at https://www.corteva.com/content/dam/dpagco/corteva/global/corporate/files/code-of-conduct/Corteva_Code_Interactive_enEN_English.pdf (last accessed Nov. 16, 2022).

relationships", or "[u]se our market strength or market information to unfairly harm or unlawfully prevent competition."

170.    BASF's current CoC[11] touts at page 14 "our integrity as a company— that means living up to the spirit and the letters of the laws that govern our industry…."  It adds at page 26 that "[w]e are committed to conducting our business solely on the basis of free and fair competition, and we strictly obey all applicable laws and regulations.  We believe that fair, well-regulated competition strengthens our market and benefits our customers.  As a market leader in various fields, BASF has special obligations under antitrust law for conducting our business in a way that promises fair competition.  We welcome this extra responsibility, and aim to lead by example, to achieve the best for our customers.  We are aware that any violation of antitrust laws can result in heavy fines, and even imprisonment, for the company, management and individuals concerned.  It is up to all of us to be alert for any situation that could potentially be seen as harmful to free and fair competition."

171.    These promises in Defendants' respective CoCs are belied by their respective conduct set forth in this complaint.  Their ultimate customers—like the Plaintiff here—relied on their self-professed integrity and law-abiding goals and were misled as a result.

172.    Accordingly, prior to the filing of the FTC Action, Plaintiff and the members of the Classes have had virtually no visibility into the Manufacturer

---

[11] Available at https://www.basf.com/global/documents/en/news-and-media/publications/reports/2020/BASF_Code_of_Conduct_2020_EN.pdf (last accessed Nov. 16, 2022).

Defendants' loyalty programs, other than those unredacted portions of the FTC's recent complaint, let alone visibility of the conspiracy to use the loyalty programs to restrain trade and maintain supra-competitive pesticide prices.

## X.    CAUSES OF ACTION

### COUNT I

### UNREASONABLE RESTRAINTS OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

173.    The Manufacturer Defendants entered into unlawful contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 with Co-conspirator Distributors.

174.    These agreements had the purpose and effect of restricting sales of generic versions of the at-issue products in order to preserve the Manufacturer Defendants' monopolies in the at-issue products and to artificially raise, fix, maintain, or stabilize the prices of the at-issue products.  Distributor Co-conspirators agreed with the Manufacturer Defendants to essentially boycott generic versions of the at-issue products.

175.    These practices were unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  Even if these violations are contended not to constitute per se offenses, they are unlawful under either a "quick look" or rule of reason analysis.

176.    Plaintiff and Class Members were injured by the Manufacturer Defendants' agreements with Co-conspirator Distributors that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of the at-issue

products at artificially high levels.  Plaintiff and the Class Members paid higher prices for the at-issue products than they would have in the absence of the Defendants' violations of Section 1 of the Sherman Act.

177.   Plaintiff and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## COUNT II

## UNLAWFUL  MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)

178.   At all times relevant, Syngenta has had monopoly power in the Relevant Markets for azoxystrobin, metolachlor, s-metolachlor, mesotrione, fomesafen, paraquat, and lambda cyhalothrin.  At all times relevant, Corteva has had monopoly power in the Relevant Markets for rimsulfuron, acetochlor, and oxamyl.  At all times relevant, BASF has had monopoly power in the Relevant Markets for boscalid, F500, glufosinate ammonium, imazamox, and pendimethalin.

179.   The Manufacturer Defendants maintained monopoly power through a course of anticompetitive and exclusionary conduct by entering and maintaining agreements with distributors and retailers that contain competition-limiting loyalty requirements and, among other things, enforcing and threatening enforcement of these requirements or the imposition of other penalties for insufficient loyalty in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

180.   Plaintiff and Class Members were injured by the Manufacturer Defendants' maintaining their monopolization of the Relevant Markets for the at-

issue products, which allowed Syngenta and Corteva to price the at-issue products at artificially high levels that bar or limit competitive entry.  Plaintiff and the Class Members paid higher prices for the at-issue products than they would have in the absence of the Manufacturer Defendant's violations of Section 2 of the Sherman Act.

181.    Plaintiff and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## COUNT III

## CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2)

182.    The Manufacturer Defendants individually conspired with the Co-conspirator Distributors to unlawfully maintain the Manufacturer Defendants' monopolies in the at-issue products through anticompetitive exclusionary agreements.  The Co-conspirator Distributors intentionally facilitated the Manufacturer Defendants' efforts to illegally maintain their monopoly power in the Relevant Markets for the at-issue products by participating in the Manufacturer Defendants' loyalty programs, which were designed to and did artificially restrict generic competition, as described above.

183.    Defendants' intent and goal was to maintain the Manufacturer Defendants' monopolies in the at-issue products so the Manufacturer Defendants and the Co-conspirator Distributors could eliminate or limit the threat from generic competition and continue to charge supra-competitive prices for the at-issue products.

184.    Plaintiff and Class Members were injured by Manufacturer Defendants' agreements with Co-conspirator Distributors that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of the at-issue products at artificially high levels.  Plaintiff and the Class Members paid higher prices for the at-issue products than they would have in the absence of Defendants' violations of Section 2 of the Sherman Act.

185.    Plaintiff and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## COUNT IV

### UNLAWFUL CONDITIONING OF PAYMENTS IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT (15 U.S.C. § 14)

186.    The Manufacturer Defendants provided payments in the form of rebates in the sale of at-issue crop protection products to Co-conspirator Distributors in exchange for Co-conspirator Distributors' agreements not to use or deal in the goods of generic competitors in accordance with the Manufacturer Defendants' loyalty programs.  This conduct substantially lessened competition and created monopolies in the at-issue products in the Relevant Markets, in violation of Section 3 of the Clayton Act (15 U.S.C. § 14).

187.    As a result, generic competition in the at-issue product Relevant Markets was substantially restrained and the Manufacturer Defendants unlawfully maintained monopolies in the at-issue products, which caused the prices of the at-issue products purchased by Plaintiff and Class Members to be higher than they

would have been in the absence of the Manufacturer Defendants' agreements with Co-conspirator Distributors.

188.   Plaintiff and the Class Members were injured and damaged because they purchased at-issue products at supra-competitive prices caused by the Manufacturer Defendants' violations of Section 3 of the Clayton Act.

189.   Plaintiff and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes, pray for judgment against all Defendants, jointly and severally, as follows:

1.   That the Court adjudge and decree that Defendants each have violated Sections 1 and 2 of the Sherman Act;

2.   That the Court adjudge and decree that Defendants each have violated Section 3 of the Clayton Act;

3.   That Plaintiff and all others similarly situated be granted injunctive relief with respect to Defendants' ongoing anticompetitive conduct;

4.   That Plaintiff and all others similarly situated be awarded damages suffered by reason of these violations and that those damages be trebled in accordance with the law;

5.   That Plaintiff be awarded reasonable attorneys' fees and costs; and

6.    That Plaintiff be granted such other and further relief as the Court may deem just and proper.

## XII.    DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), on any and all claims or issues so triable.

DATED:  December 21, 2022        Respectfully submitted,

*/s/ Sarah L. Fowler*
Sarah L. Fowler, Atty. No. 30621-49
Jason R. Burke, Atty. No. 19727-49
Blackwell, Burke & Ramsey P.C.
101 W. Ohio St., Suite 1700
Indianapolis, IN 46204
Phone: (317) 635-5005
Email: sfowler@bbrlawpc.com
Email: jburke@bbrlawpc.com

**Counsel for Plaintiff Bohrer Farms, Inc.**